Botein, J.
In this article 78 proceeding the petitioner challenges the power of the respondent, New York State Athletic Commission, to change the vote of one of the judges of a boxing match, in the absence of any explicit statutory or regulatory provision authorizing or prohibiting such action by the commission.
' The facts are substantially undisputed. On December 19, 1952, the petitioner, a professional boxer known as Joe Giardella, fought in a licensed match at the Madison Square Garden against Billy Graham, the second respondent. Two members of the commission, one of whom was the chairman, were among the large crowd in the hall.
The match lasted for its scheduled ten rounds, and then the referee and two judges assigned by the commission to officiate at the fight cast their votes to decide which of the contestants was the winner. One judge favored Graham and the referee voted for Giardella. The second judge, named Agnello, voted for Giardella, and the card upon which he tabulated his round-by-round scoring indicated that Giardella had won six rounds to Graham’s four. The announcer proclaimed Giardella the winner.
The attending officers of the commission immediately called for the records kept by the referee and judges. In the words of the commission chairman, he and the second commissioner, who also witnessed the fight, ‘ ‘ retired to a separate room and considered all the cards for about a half hour and found * * * that one of the judges, Agnello, had failed to follow the standards set forth in the Boxing Rules of the Commission * * * as to two of the rounds. Accordingly, we directed that such card be corrected to comply with the Boxing Rules, which was done.” The chairman also states that “ the commissioners were informed of rumors of a betting coup with which persons surrounding the petitioner were reported to be connected.” The effect of the change in Agnello’s ruling as to two rounds which he had awarded to Giardella was to reverse the decision. *142 Graham was now declared the victor; and the petition seeks to nullify this action by the commission.
The petitioner does not “ impugn in the slightest degree the high-minded motives and thoroughly honest intentions ” of the commission and acknowledges that “ it acted solely for what [it] believed was the best interest of boxing and sports generally.” And the respondents make no claim that in reaching his original decision Agnello was animated by any fradulent, corrupt or other base motive. The correctness, but not the honesty, of his judgment is challenged. Of course, it.is not the function of the court, employing the rules for scoring points and credits properly promulgated by the commission (Boxing Rules, § III), to now render a third decision as to whether Giardella or Graham won.
Before reaching the fundamental questions presented by this petition, I shall dispose quickly of the respondents’ preliminary objection: namely, that Giardella had no standing to sue because, allegedly, he has suffered no injury from the action of the commission. As in most money-making callings, a boxer’s earning capacity is related to his reputation and his reputation is dependent upon his success. In the sports world the interested public follows the detailed records of individual athletes and teams with avidity. It flocks to watch the athletes with winning records; and the earnings of those athletes are related directly to the number of paying spectators they can attract. Spiritually, a professional boxer may emerge greater in defeat than in victory. Materially, however, his prestige and the purses he can command are lowered. Any action which affects his record so prejudicially of necessity impairs economic rights and interests sufficiently to give the petitioner legal standing to sue.
On the merits of the main issue, petitioner cites the statute, which provides that ‘ ‘ There shall also be in attendance * * * two duly licensed judges who, with the referee, shall at the termination of each such boxing or sparring match or exhibition render their decision. A majority of the votes cast shall determine the winner.” (State Athletic Commission Law, § 23; L. 1920, ch. 912, as amd. by L. 1952, ch. 666; see to the same effect Rules of the State Athletic Commission, rule 23.) No other persons are explicitly authorized by statute or rule to render a decision in a boxing match which has continued through the scheduled number of rounds. The petitioner therefore argues that the expressed statutory formula for determining a winner is an exclusive one and precludes the action of the commission.
*143 The commission’s powers, however, are not fathomed so superficially. In the absence of an express grant or denial of authority, the inquiry only begins with the cited provisions. (Matter of Joseph Burstyn, Inc., v. Wilson, 303 N. Y. 242, 251, revd. on other grounds, 343 U. S. 495.) This conclusion is underlined by the stark statutory specification that “ the rules and regulations of boxing shall be prescribed by the commission ” (§ 22) and by the promulgation by the commission of regulations so ample and encompassing in their generality that in appropriate circumstances they could comprehend the commission’s nullification, if not reversal, of the judges’ or a referee’s decision. (See rules, 48, 67, 68.) The question presented here cannot be resolved by recourse to language alone, without that insight into the underlying purpose and intent of the statute which is so necessary to invest the language with its real meaning. We start with the basic proposition that initially all manner of pugilistic encounters for which admission fees are charged are stamped as illegal and against public policy and any participation therein constitutes a criminal offense (Penal Law, §§ 1710-1716). So vigorous are these penal sanctions that provision is made for the arrest of any person about to participate in a prize fight (§ 1715).
Inside these statutory badlands the Legislature, by enactment of the boxing law, has carefully charted a rigidly circumscribed area in which prize fighting can be conducted legally. The boxing law creates the only legal exception to the penal provisions; and unless it is complied with, all boxing activities are illegal.
The unsavory history of professional boxing in this State reveals why boxing matches and all who participate in them are by legislative policy and enactment made subject to the most inexorable and meticulous regulation (L. 1920, ch. 912, as amd.) — sometimes referred to herein as the ‘ ‘ Boxing Law ’ ’. The Legislature was plainly apprehensive of the unwholesome influence exerted by gamblers, „ criminals and other disreputable persons who dominated professional boxing. Since it featured violence, the sport attracted'full-blooded patrons who bet heavily on the outcome of the bouts. And since the moral stamina of pugilists, in that era at least, was often weaker than their physical stamina, many were not averse to “ fixing ” fights at the behest of professional gamblers. Judging from newspaper comment in 1920, the public was revolted by the sordid spectacle presented by professional boxing.
*144 Mr. Justice Seabury, then sitting at Special Term, had this to say about an earlier law: ‘ ‘ Two main purposes have prompted such legislation: First, the desire to prevent as far as possible certain brutal and degrading features which have in the past sometimes attended such contests, and, second, to promote and protect such contests when conducted within the legitimate limits of a sport. To achieve those purposes the state has created the Athletic Commission and authorized that Commission to prescribe stringent rules governing the conditions under which such contests can be held. ” (Fitzsimmons v. New York State Athletic Comm., 146 N. Y. S. 117, 120; see, also, Zwirn v. Galento, 288 N. Y. 428, 430; Baksi v. Wallman, 271 App. Div. 422, and Casarona v. Pace, 175 Misc. 269.)
Evidently the Legislature decided that the public had manifested sufficient interest in prize fighting to warrant its operation — under close and rigid supervision. But it is clear that the Legislature also decided the spectator was entitled to see a fair fight. With this end in view the statute spells out an elaborate system of bonding, licensing and penalties. Even announcers, ushers, ticket takers, box-office employees and special policemen as well as boxers, managers, trainers, seconds and others are included among those required to obtain licenses from the commission (§ 7). Elaborate provisions are made for fingerprinting every applicant for a license — including officers of a corporation; and a duplicate copy “ shall be filed in the office of criminal identification of the department of correction at Albany”. (§11.) A license may be revoked upon a finding ‘ ‘ that the licensee has, in the judgment of the commission, been guilty of an act detrimental to the interests of boxing ”. (§ 17; see, also, rules 21, 63.)
To indicate the Legislature’s continuing concern lest the criminal element infiltrate professional boxing, the statute was amended as recently as 1952, so as to make consorting with criminals, gamblers, book-makers, etc. grounds for revocation or suspension of a license (§ 17).
These are no ordinary precautions which the Legislature and the commission, under its grant of power from the Legislature, have taken in an endeavor to administer professional boxing honestly and cleanly. To appreciate how extraordinary they are one should imagine imposing them upon the average business or industry.
The statutory scheme seeks to insure to the spectator that the participants in a boxing match will strive honestly to the limits of *145 their skill and that they will be judged honestly and competently. It is in this perspective that one should view the commission’s contention that it has the authority and power to change the decision of a judge or referee, to avert, as it asserts, “ a fraud upon the public and one of the contestants ”. Considering such an assertion of power in the generality, and not in the specific setting presented by this petition, I am inclined to agree with the commission’s contention. If, as is concededly not the case here, corruption was found to have influenced a decision, it would seem that the commission is empowered to take appropriate action, as a reasonable, possibly necessary, implementation of the legislative policy in establishing the commission. “ Where it is difficult or impractical for the Legislature to lay down a definite, comprehensive rule, a reasonable amount of discretion may be delegated to the administrative officials.” (Matter of Marburg v. Cole, 286 N. Y. 202, 212.)
I believe the commission has been granted sufficient power by statute to cope with alleged fraud of serious proportions, despite its unexplained failure to deal more specifically by regulation with those situations which foreseeably could arise. (Cf. Securities Comm. v. Chenery Corp., 318 U. S. 80.) Such regulations would seem desirable in this administrative area to dispel any hint of anarchic administration, by advising licensees of their rights, conditioning the public to corrective measures and requiring the commission to think through its problems in order to formulate the rules.
Given the power in justifiable circumstances, and upon a finding of facts establishing the alleged fraud, the next question is whether it could be exercised in such summary fashion. According to the chairman, the commissioners were alerted to a closer scrutiny of this fight by “ rumors of a betting coup ”. Now, a rumor in the boxing world comes close to being a reality — at least in its potentiality for shaking public confidence in the integrity of professional boxing. The sport has been given a bad name because too many of such rumors have been proven true in the past, and public relations have become a real consideration. Other administrative agencies may wait until a rumor dissipates from its own emptiness or achieves some factual dignity; but the Athletic Commission should and must act immediately to destroy or confirm the rumor. A dominant legislative purpose is to secure and maintain the spectator’s confidence in the honesty of every aspect of the boxing match. Indeed, the statute appears to contemplate the procedure used here. (§ 5.) *146 Buie 48 of the commission provides: “ the commissioners and deputies * * * shall have full power to act and to do all things upon behalf of the Commission at any and all exhibitions * * *. Any Commissioner in attendance upon and supervising a contest or exhibition, has the full power of the Commission in the enforcement of the rules and regulations of the Athletic Commission.”
What might be unseemly and dangerous haste by other administrators was justified, might even be required, in this case. First, as just stated, such rumors should be scotched as quickly as possible if unfounded; and prophylaxis should be applied as quickly as possible, if true. Second, it is of the essence of enjoyment of a sporting spectacle that the decision follow the event immediately. Sport followers, unlike lawyers, have no patience with reserved decisions.
The summary method in which the commissioners acted, while it would be condemned in almost any other area of administrative jurisdiction, was appropriate here.
Finally, assuming the power to act summarily, without notice or hearing, was the action of the commission unreasonable or arbitrary? Certainly, the existence of an unverified rumor, dark and ominous as it might loom to the future of professional boxing, would not alone justify the commission’s decision. The finding upon which the commission relies to sustain the reasonableness of its action appears to simmer down to this: Judge Agnello made an honest mistake, which the public might misconstrue as connoting corruption — to the detriment of professional boxing. Setting aside for the moment the serious doubts as to whether the commission had power to act as it did on this finding, I cannot find any basis in the record from which such a finding could be distilled.
The commissioners found, on consideration of Judge Agnello’s card, that he had failed to follow the standards set forth in the Boxing Buies of the commission as to two rounds. No amplification of this conclusion is furnished. The corrections which they directed be made on that card changed the overall decision to a victory for Graham.
Again, the conduct of the commission must be judged by their problems and functions as envisaged and apprehended by the Legislature. The adjectives “ arbitrary ” and “ reasonable ”, unlike the adjectives “black” and “white”, have no set meaning oír all occasions. One administrator’s arbitrariness may be another administrator’s reasonableness, although the two actions *147 are identical. I do not lose sight, too, of the significance of the fact that the two commissioners personally observed the contest and based their decision on such observation. Such findings, like findings of contempt committed in the presence of the court, are difficult to translate into language, and may not be lightly overridden.
No one, least of all the petitioner, challenges the good faith of the commissioners. With all the zeal of reformers they sought to spike the disruptive rumor— a spirit which is understandable in the light of the past history of the sport. Unfortunately, the record gives no hint of the norms employed by the commissioners in changing the results of the two decisive rounds on Agnello’s card. The sole reason given by the commission, it will be recalled, was that Agnello ‘ ‘ had failed to follow the standards set forth in the Boxing Bules”; and no amplification whatsoever is furnished of this conclusory statement. Of course, good faith or a well-intentioned personal rationalization of the process by which they shifted the points for those two rounds, is not enough.
The commissioners were not presumably appointed on the basis of their expertness in judging prize fights, but because of personal stature and administrative capacity. The judges and referees, however, are in turn designated by the commission on the basis of their specialized skill, experience and integrity in judging boxing bouts.
The scoring of a prize fight is not a routine process, like the scoring of a tennis match. The commission’s rules recite the following factors, among others, which must be taken into account by ring officials in rendering their decisions: damaging effect of blows, aggressiveness, defensive work, ring generalship and sportsmanlike actions. At best, these general standards furnish no chart for a mathematical ticking off of points. A boxing official’s judgment reflects not only Ms perceptiveness and experience, but is inevitably colored by his own sense of prize fighting values. Therefore, a substantial scoring differential among ringside officials ordinarily excites no alarm in boxing circles and split decisions are no rarity. In the very match under discussion the commission did not see fit to disturb the card of the referee, who like Judge Agnello, had also voted in favor of Griardella.
Therefore, the only reason advanced by the commission for changing Judge Agnello’s card, that “ he had failed to follow the standards set forth in the Boxing Buies ”, becomes so vague *148 as to be meaningless. No facts are furnished to buttress this conclusion; no facts to indicate why the two commissioners chose to override the decision of their own acknowledged expert.
Even assuming the dubious premise that the commission had the power to change the decision upon a finding that Agnello had scored honestly but incorrectly in two rounds, there is no reasonable basis in the record for such a finding. Accordingly, the petition must be granted and the action of the respondent, State Athletic Commission, in changing the vote east by Judge Agnello is annulled.
Settle order.