Alexander Rosensweig, as Administrator of the Estate of George Flores, Deceased, Claimant, *v.* State of New York, Defendant.   (Claim No. 31049.)

Court of Claims, December 5, 1955.

*Jacob D. Fuchsberg, Irving A. Thau* and *B. Hoffman Miller* for claimant.

*Jacob K. Javits, Attorney-General* (*Edward R. Murphy* of counsel), for defendant.

YOUNG, J. On September 3, 1951, a prizefighter, George Flores, died after having participated in a boxing match in Madison Square Garden on August 29, 1951. The death gave rise to this claim.

In recent years the sport of boxing has suffered an immeasurable loss of public confidence. Boxing news is rife with rumors of foreordained losses or predetermined victories. The boxing industry is charged with gangster control, aided by strangling monopoly. Dummy managers and rapacious contracts are not unheard of. The betting coup is a real threat. (See *Matter of Tilelli* v. *Christenberry,* 1 Misc 2d 139.) " There are recurring demands and responses to those demands for more strict regulation and ' cleaning of house '.'' (*Oma* v. *Hillman Periodicals,* 281 App. Div. 240, 243.)

The shadow cast by this scandalous state of affairs has spread its pall to a degree over the trial of this claim. For that reason only, we feel constrained to state at the outset that we are not called upon to cure the ills of boxing, or even comment upon them, except so far as they may be of concern here. It is not our duty to legislate reforms and even if we were so inclined we would not be qualified. We make no findings, favorable or otherwise, except as they pertain to the death of George Flores.

To understand claimant administrator's version of causation, it is necessary to follow Flores' boxing career from at least the preceding July 24th, when he fought Johnny Cerky at the Fort Hamilton Boxing Club in Brooklyn.

At that time, Flores, twenty-one years old, had had twenty-one professional fights: sixteen wins, two losses and three draws. He had been an extremely active fighter, having had these twenty-one bouts over a period of sixteen months. We assume that during this short but busy career Flores absorbed the usual amount of punishment that is the lot of a prizefighter who has been characterized as a puncher rather than a boxer.

In the second round of the Cerky fight, Flores was hit by a series of lefts and rights to the face. His mouthpiece fell out. He was hit another series of blows to the face. His guard was down and he appeared helpless. The referee stopped the fight. Cerky was awarded the decision by a technical knockout (TKO), although, through an error, the result appears on the records of the State Athletic Commission as a knockout (KO). The attending physician at this fight was a Doctor Swetnick.

Flores' next fight was against Roger Donoghue at White Plains on August 14, 1951. Donoghue, with an impressive

record, was recognized as an adept boxer with a strong left hand attributable to his being a " turned-around southpaw ".

Before the fight, Flores was given the examination provided all fighters entering a ring in New York State. This type of examination will be described later. The attending physician was Dr. Thomas N. Bockner.

The consensus of the round-by-round scoring cards of the two judges and the referee for the first seven rounds shows Flores winning one round closely, and Donoghue winning six rounds, three closely and three, the fifth, sixth and seventh, by clear margins.

In the eighth round, Donoghue hit Flores with his left and Flores went down. The count went to eight or nine. Flores climbed to his feet and leaned against the ropes in an attitude of helplessness. Donoghue rushed him. Flores, without striking a blow or lifting his arms in defense, ducked under Donoghue's lead, walked to the other side of the ring and again leaned helpless against the ropes. The referee stopped the fight, Donoghue being the winner by a TKO.

Dr. Bockner then examined Flores both in the ring and later in the dressing room. He states that he found nothing physically wrong with the fighter. Be that as it may, from this time on to the fatal fight, for a man who had nothing wrong with him, Flores was subjected to an extraordinary amount of medical activity. In fairness to Bockner though, it should be said that nothing taking place later was at his suggestion or evidently done even with his knowledge.

This fight was on August 14th. On August 24th, a contract for a second Flores-Donoghue fight was filed with the State Athletic Commission. Between these two dates, there was much activity, the chronology of which the court has had to piece out from a welter of hazy recollections, incomplete records, missing reports and denials of responsibility.

The next day, August 15th, Flores and his manager went to see Deputy Commissioner Duberstein at the office of the State Athletic Commission. Flores said that he wanted a rematch with Donoghue. Duberstein replied that the question of a rematch was up to Billy Brown.[1]

---

1. Billy Brown at that time was assistant matchmaker to the International Boxing Club, and through it, to Madison Square Garden. Duberstein had seen Brown at the fight the previous night. Both Brown and Duberstein deny discussing a rematch, but, if they didn't, how Duberstein could tell Flores that " the question of a rematch is up to Billy Brown " is a mystery.

At this point, Duberstein telephoned Dr. Bockner and asked about Flores' physical condition. Bockner said that Flores was all right. In certification of this opinion Dr. Bockner this day made out a commission accident report which reads in part:

DESCRIPTION OF INJURY  "T.K.O."

MANNER IN WHICH SUSTAINED  "Referee stopped bout — last round. No injury to boxer — left ring in good shape."

RECOMMENDATIONS (INCLUDING X-RAYS, AND OTHER SPECIAL EXAMINATIONS)  "I believe he can continue."

If we are to believe these surface indications, this should have cleared the way for the rematch. But it didn't because Duberstein then showed an intelligent appreciation of the risks involved — an appreciation that the doctors in this case had, but failed to show. He knew that, despite Bockner's report, Flores had had two TKO's in the last three weeks. He knew that, in his own words, he'd "rather be safe than sorry". He wasn't to be rushed by Billy Brown or by Brown's saying that when he was fighting "all they wanted was a warm body". Duberstein threw the case back to the doctors by telling Flores that he could not fight again until he had had an electroencephalogram taken. In short, he was suspended.[2]

On August 16th, Flores was examined by commission Doctor Maniscalzo, with what results we do not know. On the same day an electroencephalogram (EEG) was taken by a medical technician at the commission's office. The EEG was read the same day by commission Doctor Kaplan, whose report states in part:

COMMENT: "This is a generally good record. However, there is some slowing anteriorly."

IMPRESSION: "Normal record."

Within the next few days, Billy Brown talked to Duberstein about the rematch and was told that he would have to wait until the doctor's report and the results of the EEG were known.

On August 24th, Flores was examined by commission Doctor Swetnick, with what result we do not know. On the same day, Duberstein received the following interoffice memo: "Dr. Kaplan reported that the recent electroencephalogram examination given George Flores was within normal limits".

---

2. The State Athletic Commission says this action did not mean Flores was suspended, but we hold that when a fighter is told he cannot fight until certain conditions are met, he is suspended. It's all the same, terminology notwithstanding.

Duberstein then told Billy Brown to go ahead with the rematch. A letter, dated August 24th, was sent to Flores telling him his suspension was lifted. On the same day, the contract for the rematch at Madison Square Garden on August 29th was filed with the State Athletic Commission.

At noon on August 29th, Flores and the other nine fighters on that evening's card, were examined by commission doctor Vincent A. Nardiello. Flores' examination took from ten to fifteen minutes and was a general physical, including eyes, periorbital region, oropharynx, lungs, heart, pulse rate, blood pressure, abdomen, vertebral column, extremities and nervous system.

The examination form required Flores to disclose the results of his last bout. When he told Nardiello that he had lost by a TKO, Nardiello asked, " What are you fighting for? ". Nardiello then sent for Flores' record. He saw that he had lost the Cerky fight by a KO and the previous one by a TKO. He saw Dr. Swetnick's report of the Cerky fight and Dr. Bockner's of the Donoghue fight. He disclaims knowledge of the suspension. Nardiello then certified that Flores was all right to fight.

The fight, starting about 9:30 P.M., was a fairly even one for seven rounds, with Donoghue leading on points. In the eighth round, with Flores boring in, Donoghue hit him with a right hand to the mouth. Flores straightened up — his mouthpiece fell out — he was set up for Donoghue's best punch, the left hook. Donoghue delivered it and Flores went down. From the boxing standpoint, it was the perfect combination punch, properly executed. Flores was unconscious as he fell, his head hitting the ring with a resounding thud.

Flores tried but failed to get up during the count, staying on the floor until his seconds took him back to his corner. Dr. Nardiello went into the ring, talked to him, examined him cursorily, and he appeared to the doctor to be all right.

Flores walked to his dressing room and, three minutes after his arrival there, he went into a deep coma, from which he never regained consciousness, dying four days later.

Flores was rushed from the dressing room to a hospital. He was kept under a neurosurgeon's observation until midnight when it was decided that a brain operation was necessary. The condition of the brain brought to light by the operation disclosed factors from which can be drawn two medically inescapable conclusions:

1. The absence of a massive hemorrhage rules out the injury to Flores being the result of a single blow.

2. The amount of edema present at this very early stage, i.e., two hours after the fight, was not in keeping with the time elapsed; the edema present could be accounted for only by an injury to the brain prior to the August 29th fight.

In response to this evidence, we find that George Flores was suffering from a brain injury before he fought Roger Donoghue on August 29th.

Claimant seeks damages for conscious pain and suffering, hospital and medical expenses and wrongful death. The negligence alleged is twofold: that the TKO by Cerky five weeks before and the TKO by Donoghue two weeks before made it unsafe, to the knowledge of the State Athletic Commission, to permit Flores to fight on August 29th; that the ring was so constructed and equipped as to be dangerous and unsafe.

The latter argument we shall decide briefly. We believe that the State Athletic Commission was actively and diligently interested in finding an improved ring padding. It is true that a new and better padding was found and approved in June, 1951. However, the new padding material, Ensolite, was high on the armed forces' priority list and the Korean War was on. We believe the State's failure to have the ring at Madison Square Garden equipped with the new padding on August 29th excused.

What about Flores' assumption of risk? Is there not, inherent in the sport of boxing, a risk of death through brain injury incurred not necessarily in one particular fight but through an accumulation of blows suffered through a series of fights? If no other force intervened, Flores assumed this risk. But, if negligence on the part of the State intervened — if, so to speak, there was exerted an independent force which would condition Flores' appreciation of the risk — then he did not assume the risk.

A contestant, assuming the risks inherent and obvious in the sport, does not assume the risk of injury through the negligence of another. (*Morse* v. *State of New York*, 262 App. Div. 324, appeal dismissed 287 N. Y. 666; *Povanda* v. *Powers*, 152 Misc. 75; " Liability for injury to or death of participant in game or contest ", 7 A. L. R. 2d 704. See, also, *Saari* v. *State of New York*, 203 Misc. 859, affd. 282 App. Div. 526, motion for leave to appeal denied 306 N. Y. 984; *Schmidt* v. *State of New York*, 198 Misc. 802.)

To hold the State negligent, two questions must be answered affirmatively: (1) Should Flores' brain injury have been discovered or reasonably anticipated by the doctors examining him?; (2) Is the negligence of the doctors attributable to the State of New York?

Bearing upon this negligence is the claimant's allegation of the State's attitude toward the Medical Advisory Board. The personnel of this board should not be confused with the doctors designated by the State Athletic Commission mentioned above.

Section 12-a of chapter 912 of the Laws of 1920 (added by L. 1948, ch. 754, § 2) provided for the establishment of a Medical Advisory Board within the division of the State Athletic Commission. It was to consist of nine members to be appointed by the Governor. The law provides substantially that this board should recommend to the commission standards and procedures, derived from medical experience, research and knowledge, which would eliminate from boxing so far as possible the risk of injury from any cause.

Governor Dewey appointed nine doctors prominent in the different specialties of medicine which have some relation to boxing injuries. It was a tribute to these doctors that they were willing to sacrifice time from remunerative practices to take up this work, motivated solely by a desire to further medical safety in the sport of boxing.

Claimant contends that the State Athletic Commission, while not actively opposing the board, did adopt a policy best described as passive resistance. He claims that the board initially attacked its problems with vigor, but it ran into a stone wall of commission indifference.

We concur with claimant that the doctors gradually lost interest; that some soon stopped going to meetings and finally withdrew altogether; that by 1951, the Medical Advisory Board consisted of one or two doctors and seven or eight vacancies. However, from this state of facts, we cannot draw the same conclusion as does claimant. We must be guided solely by the record in this case and by that record we cannot say that it shows with reasonable certainty the responsibility of the State Athletic Commission for the disintegration of the Medical Advisory Board.

Bearing upon the alleged negligence of the doctors who examined Flores in not discovering or anticipating his brain injury prior to the August 29th fight — we believe the medical testimony conclusively establishes the following propositions:

1. A person can suffer a brain injury as a result of trauma without there being any positive clinical or neurological indications.

2. That a single EEG, unless it is positive, is entirely inconclusive.

3. That an EEG taken two days after a trauma is inconclusive if for no other reason than the lapse of time.

4. That an EEG, unless it is positive, is of value only as a standard of comparison with other EEG's taken before it or after it.

5. That good medical practice requires that a person who has been knocked out or received a severe beating about the head be kept quiet and inactive for a period of from six weeks to two months.

6. That, in no event, should a person who has been knocked out or received a severe beating about the head be subjected to the possibility of further trauma within a two months' period.

Each doctor who examined Flores from the time he was examined by Dr. Swetnick after the Cerky fight to Dr. Nardiello's examination just before the bout on August 29th had the power to suspend Flores or to recommend his suspension to the commission. The fact that this was not done is an indictment of each of the doctors and a more serious indictment of the entire system of medical examinations.

Fundamentally, the commission has surrounded itself with laws, rules and regulations which appear, at first glance, to be adequate. Chapter 912 of the Laws of 1920 as amended, provided in substance:

§ 13. Each promoter shall, at his own expense, have in attendance at every boxing match a physician designated by the commission.

§ 23. All boxers must be examined by a physician designated by the commission before entering the ring, the cost to be borne by the promoter.

§ 24. The promoter shall file with the commission reports of medical examinations within twenty-four hours of a contest.

Section 41 of the rules and regulations of the State Athletic Commission establishes a schedule of compensation for the attending physicians (N. Y. Official Compilation of Codes, Rules & Regulations, p. 1220). Section III of the boxing rules of the commission directs an examination at weighing-in time and within three hours of entering the ring by commission-designated physicians, who must certify in writing that the contestant is in good physical condition to fight. It further directs the

physician to be in attendance during the fight and be prepared to deal with any emergency.

These provisions read well and would undoubtedly have worked well had not, according to the evidence, a ludicrous custom of professional courtesy built up among the commission doctors. This practice was to leave the question of suspension up to the doctor who had been in attendance at the last fight. The tragic result of this Alphonse-Gaston attitude is best exemplified in Dr. Nardiello's testimony.

He agreed that good medical practice demands a layoff for boxers who have suffered a knockout or a severe beating about the head, the layoff to be from six weeks to two months. He agreed that in no event should such a boxer be subjected to the possibility of further trauma within that time. It seems that he had even written a magazine article recommending that this layoff be made mandatory. He showed wonderment when he asked Flores why he was fighting when he had been technically knocked out two weeks before. After that, he found out that not only had Flores had the knockout two weeks before, but had also had another knockout three weeks before that. He certainly must have known that he was there, presently examining Flores, because the State of New York wanted the benefit of his medical judgment. He knew that he had the power to suspend Flores. The question logically presents itself — why didn't he do it? Because, he says, the matter of suspension was up to Dr. Bockner — he had been the attending physician at Flores' last fight.

This kind of reasoning calls for a doctor, who at the time is the sole master of the patient's fate, to discard his own medical knowledge and experience, to push aside his own observations and to submerge his own conscience, to defer to the judgment of someone else. This type of reasoning opens the door to such tragic and foreseeable consequences that we hold it to be negligence.

We feel that Dr. Nardiello had a positive duty to report and act upon whatever his knowledge and experience told him were Flores' disabilities, regardless of the time of their origin. We cannot conceive what would make Dr. Nardiello think that his examination was only limited to disabilities incurred since the last physical examination. We believe that Dr. Nardiello's knowledge and experience told him that Flores had no right to be fighting on August 29th. No possible concept of his duty can excuse his failure to inform the State, if not Flores, of his judgment.

Lest our findings be mistaken, we do not confine it to Dr. Nardiello. It includes all the doctors who examined Flores and refused to heed the dictates of their own knowledge and experience. Nor do we believe that there is justification in saying that the blame is the State Athletic Commission's because it permitted this system of medical examinations to exist.

Whether the commission knew of the system or not, it had to rely on the doctors. It had no reason to believe that the doctors would view the mandatory and requested examinations as empty gestures, rendered meaningless by an examination by a commission physician at the last fight.

Our final determination must be whether or not the doctors have a relationship to the State of New York which would make the State liable for their negligence.

An examination of the pertinent statutes reveals that boxing in the State of New York is stringently regulated by government, more so than any other field of activity known to this court. A commission deputy must be present at every match and must make a report of it. The commission is " vested with the sole direction, management, control and jurisdiction over all * * * boxing * * * matches, professional as well as amateur, to be conducted, held or given within the State of New York " (L. 1920, ch. 912, § 6, as amd.) The commission has sole control, authority and jurisdiction over all licenses and these are required of " corporations, referees, judges, matchmakers, timekeepers, corporation treasurers, box office employees, ticket takers, doormen, ushers, professional boxers, * * * their managers, trainers, seconds, announcers and special policemen " (L. 1920, ch. 912, § 8, as amd.). The commission appointed the doctors to the panel from which the promoters picked one for the examinations. The commission designates the form and character of the examinations. The commission designates the fee to be paid to the doctors by the promoters. The State of New York derives a considerable revenue from each match through taking a percentage of the gross receipts.

" In this state the Legislature, in creating the New York State Athletic Commission, has attempted to legalize boxing when conducted under the jurisdiction of the State Athletic Commission. Confronted with the question as to whether it should prohibit prize fighting or sparring altogether, or leave such contests unaffected by legislation, the lawmaking body of this state has adopted a middle course, and has legalized boxing when conducted under state control. Two main purposes have prompted such legislation: First, the desire to prevent as far

as possible certain brutal and degrading features which have in the past sometimes attended such contests, and, second, to promote and protect such contests when conducted within the legitimate limits of a sport. To achieve those purposes the state has created the Athletic Commission and authorized that Commission to prescribe stringent rules governing the conditions under which such contests can be held." (*Fitzsimmons* v. *New York State Athletic Comm.*, 146 N. Y. S. 117, 120, affd. without opinion 162 App. Div. 904.)

Judicial notice has been taken that boxing is regulated by government. (*Oma* v. *Hillman Periodicals,* 281 App. Div. 240, *supra.*)

For other cases discussing directly or alluding to the powers of the State Athletic Commission, see *Rosenfeld* v. *Jeffra* (165 Misc. 662); *Matter of Tilelli* v. *Christenberry* (1 Misc 2d 139, *supra*); *Casarona* v. *Pace* (175 Misc. 269); *Baksi* v. *Wallman* (62 N. Y. S. 2d 26, affd. 270 App. Div. 995, mod. 271 App. Div. 422, affd. 297 N. Y. 456), and *Matter of Christensen* v. *Helfand* (208 Misc. 302).

While there are no cases at hand which have decided directly the legal relation of the doctors to the State Athletic Commission we are able to find numbers of cases deciding analogous situations.

The mere existence of the power to select the man and to pay his wages does not constitute a controlling test of the relationship of master and servant creating liability. (*Callahan* v. *Munson S. S. Line,* 141 App. Div. 791, citing cases.) Direction and control are the criteria rather than authority to designate time and place of work. (*Bartolomeo* v. *Bennett Contr. Co.,* 245 N. Y. 66.)

The type of control exercised by the State Athletic Commission leaves no doubt that the doctors were its servants, with the State being liable for the injuries caused by their negligence.

Claimant's Exhibit No. 14 for identification, offered in evidence and on which decision was reserved on page 550 of the minutes, is hereby excluded.

An award is made in an accompanying decision.