LEE OMA, Respondent, *v.* HILLMAN PERIODICALS, INC., et al., Appellants.

First Department, February 3, 1953.

*Alfred H. Wasserstrom* for appellants.

*Abraham H. Jackness* of counsel (*Sydney Weitzer,* attorney), for respondent.

BREITEL, J.  In an action for libel and for violation of sections 50 and 51 of the Civil Rights Law, Special Term denied a motion to dismiss the complaint for legal insufficiency.  Defendants appeal.

Defendants published an article in a monthly magazine called "Pageant".  The article is annexed to the complaint.  It was entitled "Let's Abolish Boxing" and was written about the title subject by the defendant Cannon, a sports writer.  The closing sentences of the article reflect its general purport: "I must be truthful.  It is the most exciting sport I cover when properly conducted.  But no one would be hurt if it were abolished.  It is the garbage pile of sports.  The few who transcend it have my respect.  Still it damages more young men than it helps.  It is the sanctuary of the scoundrel and it always has been a toy of the rogue.  The hell with it."

The article is written in racy sensational style about alleged corruption and degradation in professional boxing with illus-

trative anecdotes. It emphasizes that innocents are drawn into the field by highly speculative opportunities of making substantial windfall sums. It likewise emphasizes the physical dangers to professional fighters.

Plaintiff is a professional fighter. He is not named or singled out as an individual in the article. On the back cover of the magazine a photograph of his head appeared. The photograph fills all but a small corner of the cover. At the lower left appeared plaintiff's name, '' Lee Oma ''. At the upper left, where the photograph did not fill the corner space, appeared the words: '' Tycoon — this man can make $25,000 on a single deal, but it might cost him his life. Why? See page 24.''

Judge CROUCH on behalf of the Court of Appeals has stated:

'' The law of defamation is concerned only with injuries to one's reputation. Except to the limited extent provided by statute (Civil Rights Law [Cons. Laws, ch. 6], § 50), there is no right of privacy. (*Roberson* v. *Rochester Folding Box Co.,* 171 N. Y. 538.) Written words, the effect of which is to invade privacy and to bring undesired notoriety, are without remedy, unless they also appreciably affect reputation. This is the domain, not of positive law, but of obedience to the unenforceable. (' Law and Manners ' by Lord MOULTON, Vol. 134 The Atlantic Monthly [July, 1924], 1.) From such harms one is protected only by the code of common decency.

'' Reputation is said in a general way to be injured by words which tend to expose one to public hatred, shame, obloquy, contumely, odium, contempt, ridicule, aversion, ostracism, degradation or disgrace, or to induce an evil opinion of one in the minds of right-thinking persons, and to deprive one of their confidence and friendly intercourse in society. (*Sydney* v. *Macfadden Newspaper Pub. Corp.,* 242 N. Y. 208.) '' (*Kimmerle* v. *New York Evening Journal,* 262 N. Y. 99, 102.)

The article contains matter highly defamatory of various unnamed characters in the professional boxing sport, particularly in the managerial and promotional level. That is no basis for libel, because '' an impersonal reproach of an indeterminate class is not actionable.'' (*Gross* v. *Cantor,* 270 N. Y. 93, 96.) The concluding sentences of the article quoted above are amply supported, if the article states the truth. What is significant from the point of view of this complaint is that the article repeatedly stresses that many fighters, particularly the younger ones, are victims of the corruption and degradation in the sport.

Thus, for example (referring to a named boxer), the article states: "What a disgrace it is that this gallant little man should have to humiliate himself and chance death and permanent injury * * *. It is a crime against him that he is allowed to fight * * *." "But the fighter is the servant of managers and matchmakers and is the puppet of promoters. Many fighters are ruined because of the greed of managers * * *;" and of course, the opening sentence of the article: "Some prize fighters occasionally achieve a nobility which is unmatched in the arts, the sciences, the professions or commerce."

Hence, it is a misreading of the article to hold that it accuses all classes in the sport of corruption and immorality. In fact, the distinction is made hard between the fighter and those who manage, train and promote the fighter.

The article makes it clear that the fighter is a victim of the sport, and that he participates for reasons of economic necessity, or inordinate youthful ambition. It does not necessarly follow that to say of one that he is or may be a victim of the corrupt and degraded, that one may not be the subject of defamation. On the other hand, victimization is surely a subject of fair comment, especially in a field in the public eye. It is regulated by government. There are recurring demands and responses to those demands for more strict regulation and "cleaning of house". Of this we take judicial notice. It therefore is permissible for one purportedly informed in the field to comment thereon. Any other view would be to curtail fair comment where it is most needed, namely, to expose victimization. One who engages in a public field, whether of entertainment, sport or politics must expect such critical review. Such a one may not complain unless he is in fact falsely accused of wrongdoing. There is no such accusation against this plaintiff as an individual or against the class of fighters of which he is a member. (Seelman on Law of Libel and Slander, ch. XIII, especially par. 246.)

Moreover, reading the article, there is nothing to the discredit of plaintiff, even if it should engender feelings of regret and sympathy for him, which regret and sympathy, true enough, he does not seek and perhaps would rather not have. Thus in the *Kimmerle* case (262 N. Y. 99, 103, *supra*) the court said: "Without a suggestion in the article to the discredit of plaintiff, how could any just and right-thinking person reading it enter-

tain any feelings except regret and sympathy for plaintiff? Embarrassment and discomfort no doubt came to her from the publication, as they would to any decent woman under like circumstances. Her own reaction, however, has no bearing upon her reputation. That rests entirely upon the reactions of others." In the *Kimmerle* case, plaintiff was not in the public eye, as is the plaintiff here. The application of the reasoning is, therefore, even greater.

We turn now to the question of whether plaintiff's right to privacy has been invaded in violation of sections 50 and 51 of the Civil Rights Law. Those statutes forbid, without written consent, the use of one's picture for purposes of trade or advertising.

This was an article on a matter of current interest. Plaintiff was, as he alleges, a well-known boxer. As such, he had projected himself into the area of public view and comment. This fact distinguishes the case from that of *Blumenthal* v. *Picture Classics, Inc.* (235 App. Div. 570, affd. 261 N. Y. 504) where only incidentally plaintiff's trade brought her into the public view. If in any way he was related to the article a reproduction of his picture was permissible. See *Gautier* v. *Pro-Football, Inc.* (278 App. Div. 431, 435, affd. 304 N. Y. 354) in which the late Mr. Justice SHIENTAG on behalf of this court makes an excellent analysis of the privilege of using names and pictures in the coverage of news and current affairs. True, the use of plaintiff's picture was designed to sell the magazine. So is the headline in a newspaper. The question is whether it is related to the article. The caption on the picture: " Tycoon — this man can make $25,000 on a single deal, but it might cost him his life. Why? See page 24 " was a relevant association with the article which stressed the opportunities and the dangers to which the class of fighters is exposed. Plaintiff is a member of that class.

Plaintiff is a public figure in the news and his activities were a subject of fair comment. His activities as a member of the class of fighters were the subject of discussion, and his picture was directly related to the discussion. The publication of plaintiff's picture was not for purposes of trade or advertising, but to illustrate an article on public affairs. An illustration is relevant, even though being but an illustration there was no necessity for its use to the exclusion of other parallel illustrations. It is immaterial that its manner of use and placement was designed to sell the article so that it might be paid for and read.

*Lahiri* v. *Daily Mirror, Inc.* (162 Misc. 776) is most applicable. In that case the article dealt with exposure of the Indian rope trick. Plaintiff, a Hindu musician, claimed a violation of his right of privacy because of the publication of his picture and that of a dancer over the caption " MYSTIC. Something of the Occult Philosophy Which Dominates the Far East May Be Seen, Even in the Gestures and Postures of Indian Dancers, Such as Those Portrayed Above.'' The relation of the photographs to the article was therefore most attenuated. It was considerably less relevant than was the photograph of this plaintiff to the article on boxing. Mr. Justice SHIENTAG, for Special Term, in a most learned opinion, held that the publication was not actionable. Said he, at pages 782, 783: '' The instant article is not one of fiction. It is clearly one concerning a matter having a legitimate news interest. A British society had offered a substantial prize to any one able to perform the ' famous rope trick.' The author of the article showed how the trick was allegedly performed in India and the possibility of the society being called upon to pay the prize. The use of professional actors to pose for some of the pictures illustrating the article did not change its character from one of news or general information to one of fiction. The only question is whether the picture complained of has so tenuous a connection with the article that it can be said to have no legitimate relationship to it. I think it has a relationship to the article. It is used to illustrate one of the points made by the author — the mystical quality of the East. There could have been no other motive for putting it in. It would be far-fetched to hold in this case that the picture was not used in an illustrative sense, but merely to promote the sale of the paper.''

We are dealing here with a matter of the highest public interest, printed comment on public affairs, and the lines may not be drawn so tight as to imperil more than we protect.

The order of Special Term should be reversed and the motion dismissing the complaint should be granted.

PECK, P. J. (dissenting). The use of plaintiff's name and photograph on the back cover of defendant's magazine does not, in my opinon, fall into the category of any exemption defined by previous decisions under the Civil Rights Law. The inside of the article referred to on the outside cover was not about plaintiff as a public figure. He was in no way mentioned in the article or referred to in any way. Nor was he even used as an

illustration. The photograph, its pose, and place on the cover were plainly used to catch the eye and advertise the magazine and the article. I think that is not a permissible use of one's name and visage and that plaintiff is not subject to such use because he happened to be a public figure in a sense.

COHN, and VAN VOORHIS, JJ., concur with BREITEL, J.; PECK, P. J., dissents in opinion in which CALLAHAN, J., concurs.

Order reversed, with $20 costs and disbursements to the appellants and the motion granted.