Thomas **TAGGART,** Appellant,

v.

**WADLEIGH–MAURICE, LTD., and Warner Bros., Inc., Appellees.**

**No. 72–1531.**

United States Court of Appeals, Third Circuit.

Submitted Under Third Circuit Rule 12(6) July 2, 1973.

Reargued Sept. 5, 1973.

Filed Sept. 21 1973.

Rehearing Denied Oct. 24, 1973.

Van Dusen, Circuit Judge, dissented and filed opinion.

Charles J. Farley, Jr., Orange, N. J., for appellant.

Roger S. Clapp, Clapp & Eisenberg, Newark, N. J., for appellees.

Before VAN DUSEN, GIBBONS and HUNTER, Circuit Judges.

## OPINION OF THE COURT

GIBBONS, Circuit Judge.

This is an appeal from the grant of defendants' motion for summary judgment. The pleadings, affidavits, and depositions on file establish that the appellant Taggart is an employee of Port-O-San, a corporation engaged in the business of furnishing and servicing portable latrines. Taggart was sent by his employer to Bethel, New York in August, 1969 to service such portable latrines furnished by Port-O-San to the promoters of the Woodstock music festival. While he was servicing the Port-O-San latrines he was, according to his complaint and deposition, diverted from that work and engaged in conversation by agents of defendant Wadleigh-Maurice, Ltd., who were filming the festival, and photographed by sound motion picture. Wadleigh-Maurice, Ltd. during the course of the festival took over 315,000 feet of film (about 120 hours of viewing). From this 315,000 feet of film a feature length "documentary" was assembled, which defendant Warner Bros. Inc. undertook to distribute for commercial viewing. There is no dispute that the festival, the preparation of the film, and its distribution to theatres

were all undertaken for commercial profit-making purposes. In those parts of the 315,000 feet of film chosen for inclusion in the "documentary" and thereby given widespread public dissemination is a sequence of approximately two minutes depicting Taggart emptying latrines. Taggart's deposition discloses the circumstances in which he was photographed:

"Q. Basically, at the time you were at Woodstock and you were approached by these two men, had you ever seen them before?

A. No, I never did.

Q. Did you know who they were?

A. No, I have no idea.

Q. How did they engage you in conversation?

A. Well, as I said before, as I was working these two men just came up and started talking to me. What are you doing there, I think was the key sentence. What are you doing there, they said.

Q. You responded to the conversation that ensued?

A. Yes. From there on, I went on about my business, about doing my work. As I was, they spoke to me and asked me what was this, and so forth.

Q. Did you respond to anything they asked you?

A. I responded to the questions they asked me.

Q. You mentioned before that they had cameras. How big were the cameras they had? Can you show us?

A. They looked like the little square box or something like that.

MR. FARLEY: Indicating about six inches long.

A. Maybe rectangular.

Q. Do you have a home movie camera yourself at home?

A. I have one, yes. It would be not in that category. It would be more like my son's. Thomas has one with a zoom thing on it and stuff like that.

Q. The camera that the man was holding, was that similar to the camera your son has?

A. It would be something like that.

Q. So the cameras were like home movie type cameras?

A. Yes.

Q. Did you see any of those large cameras that they used to depict when they show the news?

A. No.

Q. You didn't see anything like that?

A. No. Whatever it was they had was strapped. They had them in a strap on their neck.

Q. A strap to hold the camera?

A. Yes, a little bit of a strap.

Q. In the general vicinity through these days you were at the festival, were there many people with cameras of various types?

A. As I recall, I saw different types of cameras. I wouldn't say there was a wholesale thing with cameras there, you know.

Q. At any time did anyone ask your permission to take the picture?

A. Well, not that they asked me. Nobody came up to me and said, can I take your picture, nothing like that. They just came up and started talking. As they were talking——

Q. Was one talking to you and the other took the picture?

A. It was a combination. I don't know if I'm making myself clear here
\* \* \*

\* \* \*

Q. In relation to the two men taking your picture did you know that they were taking it for any public released?

A. No. I had no idea of that."

Taggart contends that the sequence in which he was interrogated while performing his necessary though not necessarily pleasant employment was edited into the "documentary" in such a way as to achieve, at his expense, a comic ef-

fect. That this may well have been the intended and actual effect is supported by evidence in the record of the reaction of critics. For example, Kathleen Carroll, the critic, stated "[T]he funniest scene shows the latrine attendant proudly demonstrating his job." Craig McGregor, writing in the New York Times, April 19, 1970, stated ". . . and the man who is the real schizophrenic hero of Woodstock, the Port-O-San man, who empties the latrines of the beautiful people and has one son there at Woodstock and another flying a DMZ helicopter in Vietnam." Taggart contends that while he was engaged in his ordinary work he was without warning, and without consent, drawn into a conversation and photographed so that the sequence could be used as a key part of the theme of the "documentary" which was being prepared as a commercial enterprise.

When Taggart learned that he had been included in the commercial film he protested to the defendants, but they refused to delete the scene and proceeded to distribute the film nationwide. As a result, he alleges, he has suffered mental anguish, embarrassment, public ridicule, and invasion of his right to privacy which has detrimentally affected his social and family life and his employment. His deposition supports his contention that such ongoing damaging effects have occurred and are continuing. In this diversity civil action he seeks damages and an injunction against continued distribution of the offending scene. The complaint contains a demand for a jury trial. Fed.R.Civ. P. 38(b).

Moving for summary judgment, the defendants placed principal reliance on Man v. Warner Bros. Inc., 317 F.Supp. 50 (S.D.N.Y.1970). In that case Man, a professional musician, was at Woodstock, where at 4 A.M. he mounted the stage and played "Mess Call" on his Flugehorn. His performance was photographed by the Wadleigh-Maurice cam-

era crews, and was edited into the documentary without his consent. He brought a diversity action for injunctive relief pursuant to New York's right of privacy statute, N.Y.Civ.Rights Law § 51 (McKinney's Consol.Laws, c. 6, 1948), and moved for a preliminary injunction. The defendant made a cross motion for summary judgment, which was granted. The district court recognized that § 51 may not be applied to afford relief either to a public figure or in a matter of public interest in the absence of proof that the defendant published false material with knowledge of its falsity or in reckless disregard of the truth. *E.g.,* Time, Inc. v. Hill, 385 U.S. 374, 87 S.Ct. 534, 7 L.Ed.2d 456 (1967). In justification for the grant of summary judgment the court pointed out (1) that a professional musician who mounts a stage to give a performance before an audience of 400,000 is a public figure, (2) that in any event the depiction of his performance was merely a factual depiction of his participation in a newsworthy event, and (3) that plaintiff's forty-five second performance was *de minimis.*

The transcript of the argument on the motion for summary judgment in this case discloses that the district court appreciated several distinctions between this case and *Man.* First, Taggart was not a professional musician performing before an audience of 400,000. He was an ordinary working man going about his lowly task. Second, the reaction of the critics suffices to prevent the entry of summary judgment on a *de minimis* basis. The latrine sequence apparently makes a significant and memorable contribution to the film's overall impact. Thus, if summary judgment is to be sustained, it must be sustained solely because Taggart was a participant in a newsworthy event, and as such, outside the protection of § 51 or some other statutory or common law right of privacy.[1] The district judge recognized,

---

1. Taggart resides in New Jersey. The governing law in New Jersey on the right of privacy from commercial exploitation is discussed in Canessa v. Kislak, Inc.,

97 N.J.Super. 327, 235 A.2d 62 (L.Div. 1967). We do not here reach the issue of which state's law governs.

438

however, that it would be one thing to photograph Taggart as he went about his duties at a newsworthy event and to include such a photograph in a factual description of the event, but quite another thing to deliberately draw him out in conversation for the purpose of making him an inadvertent performer in a sequence intended to be exploited for its artistic effect. Recognizing this distinction, the district judge viewed the offending film sequence, and ruled:

"I react, as Mr. Dershowitz's remarks indicate, as the reasonable man might react after seeing the film. I come to a different conclusion after having seen the film than I did from reading just the dialogue. It was not so much a drawing out as to expose him to a substantial participation in the film. The event fits in a perspective of moving from one aspect of this festival to the next. He was not diverted from the work he was doing and brought, so to speak, upon the stage and made somebody separate and apart from the fellow who was working at the time they focused the camera on him. It is a very difficult line to draw.

I believe as you do, as I indicated before the luncheon recess, that there still is an area left where somebody does set out deliberately to make somebody participate in gaining a profit without compensation to him. But there is still an area where that is not protected by the First Amendment cases. I do not think that falls on this side of the line. I feel that summary judgment is indicated and I will grant the motion." (Tr. at 32).

■ The difficulty with this ruling is that it chooses between Taggart's version, that he was drawn out and made an involuntary performer, and the defendants' version, that he was a mere participant in a newsworthy event. The court did so on the basis of a view of a part of the whole film. The sequence which he viewed undoubtedly was significant evidence in support of the defendants' position. But it was only evidence to be

weighed against Taggart's testimony and the reaction of the critics. That weighing process was made before the plaintiff had had the opportunity to present his full case, and it was made by the judge in a case in which a jury trial was demanded. Whether Taggart had been drawn out as a performer rather than merely photographed as a participant in a newsworthy event is on this record at best a mixed question of law and fact. Factual determinations in a § 51 case are for the jury. Garner v. Triangle Publications, Inc., 97 F.Supp. 546 (S.D.N.Y.1951).

Clearly, then, the record presents disputed fact issues. We can affirm the grant of summary judgment on such a record only if we are prepared to hold that as a matter of law the defendants are entitled to judgment even if Taggart was deliberately drawn out as a performer in a commercial film. Such a ruling would leave very little to § 51 or to any similar statutory or common law right of privacy. It would be predicated upon a more absolutist interpretation of the first amendment than has yet been espoused by a majority of the Supreme Court. But more important, such a ruling, if it is to be made, should be made on a record in which the facts have been fully developed. Only with such a record can the necessary balance between the conflicting rights of personal privacy and of freedom of expression properly be struck. We realize that requiring the defendants to defend in a trial rather than to obtain summary judgment puts them to additional expense, and arguably subjects their first amendment rights, should those rights ultimately be held to prevail over Taggart's right to privacy, to that much extra "chill." In the context of the problem—their commercial exploitation of Taggart's allegedly induced performance —this degree of "chill" seems to us *de minimis* when compared with the unsatisfactory alternative of ruling on a potentially serious conflict between legally protected rights without a complete record.

■ ■ Judge Van Dusen, dissenting, urges that where "constitutional fact" is involved a district court may on a motion for summary judgment, or an appellate court may on appeal, resolve disputed fact issues. Article III, Section 2 of the Constitution gave the Supreme Court appellate jurisdiction "both as to Law and Fact". This clause produced an adverse public reaction which resulted in the seventh amendment preserving the right to trial by jury in civil cases and providing further that "no fact tried by a jury, shall be otherwise re-examined in any Court of the United States, than according to the rules of the common law." Disputes over "constitutional fact" are no exception to the seventh amendment. *See, e. g.*, Vandenburg v. Newsweek, Inc., 441 F.2d 378, 379 (5th Cir.), cert. denied, 404 U.S. 864, 92 S.Ct. 49, 30 L.Ed.2d 108 (1971), affirming denial of summary judgment. Just as disputed facts in a nonjury case are determined by trial and not on summary judgment motion, a trial judge's decision to instruct the jury with the *New York Times* standard or an appellate court's de novo review of "constitutional fact" are both made after a full trial on the contested factual issues. Properly viewed these represent nothing more than the application of a governing legal standard to undisputed facts or to facts that are viewed in a light more favorable to one party. They do not involve the resolution of such credibility issues as whether or not Taggart was drawn out or was a willing participant. The label "constitutional fact" does not permit even an appellate court reviewing a full record to resolve credibility issues.

The judgment of the district court will be reversed and the case remanded for further proceedings consistent with this opinion.

VAN DUSEN, Circuit Judge (dissenting):

I respectfully dissent and would affirm the granting of summary judgment by the district court.

The court has today characterized the issue before the district court as whether Mr. Taggart was "drawn out" and made an involuntary performer or whether he was a mere participant in a newsworthy event and concluded that such factual determinations are for the jury. If this case involved only the application of the New York statute to the factual situation presented here, I would agree that summary judgment was improperly granted.

However, the central issue before the district court was whether the rule of Time, Inc. v. Hill, 385 U.S. 374, 87 S.Ct. 534, 17 L.Ed.2d 456 (1967), applied to the facts of this case. The question of whether or not Mr. Taggart was a participant in a newsworthy event, even if properly characterized as one of fact, involves a constitutional decision as to the proper application of a First Amendment standard. It must, therefore, be considered one of "constitutional fact" which the Supreme Court has said to be subject to de novo review.[1] Rosenbloom v. Metromedia, 403 U.S. 29, 53–54, 91 S.Ct. 1811, 29 L.Ed.2d 296 (1971) (opinion of Brennan, J.). In New York Times Co. v. Sullivan, 376 U.S. 254, 285, 84 S.Ct. 710, 728, 11 L.Ed.2d 686 (1964), the Court said:

"This Court's duty is not limited to the elaboration of constitutional principles; we must also in proper cases review the evidence to make certain that those principles have been constitutionally applied. This is such a case, particularly since the question is one of alleged trespass across 'the line between speech unconditionally guar-

---

1. Indeed, in the very cases which first enunciated the First Amendment privilege claimed here, the Supreme Court determined for itself the question of whether the facts alleged and proved at trial met the standard as to what kind of public official or public issue would require a showing of actual malice to allow recovery in a libel action. See New York Times Co. v. Sullivan, 376 U.S. 254, 270–271, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964); Associated Press v. Walker, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967).

anteed and speech which may legitimately be regulated.' [Citing case.] In cases where that line must be drawn, the rule is that we 'examine for ourselves the statements in issue and the circumstances under which they were made to see . . . whether they are of a character which the principles of the First Amendment, as adopted by the Due Process Clause of the Fourteenth Amendment, protect.' "

It follows that at trial such issues are properly decided by the judge on a motion for summary judgment, where there are no other genuine issues of material fact.

Furthermore, the Supreme Court has stated that in cases where a First Amendment privilege is claimed under the doctrine of New York Times Co. v. Sullivan, *supra*, "as is the case with questions of privilege generally, it is for the trial judge in the first instance to determine whether the proofs show respondent to be a 'public official'." Rosenblatt v. Baer, 383 U.S. 75, 88, 86 S.Ct. 669, 677, 15 L.Ed.2d 597 (1966). Lower courts have generally assumed with little or no discussion that the question of whether a particular event constituted a matter of "public interest" is also for the trial judge to determine. *See, e. g.,* Bon Air Hotel, Inc. v. Time, Inc., 426 F.2d 858, 861–62 (5th Cir. 1970); Wasserman v. Time, Inc., 138 U.S.App.D.C. 7, 424 F.2d 920, 922, cert. denied, 398 U.S. 940, 90 S.Ct. 1844, 26 L.Ed.2d 273 (1970); Time, Inc. v. McLaney, 406 F.2d 565, 566 (5th Cir. 1969); United Medical Laboratories, Inc. v. Columbia Broadcasting System, Inc., 404 F.2d 706,

711–712 (9th Cir. 1968); Cerrito v. Time, Inc., 302 F.Supp. 1071, 1073 (N.D.Cal.1969); Sellers v. Time, Inc., 299 F.Supp. 582, 586 (E.D.Pa.1969); aff'd on grounds of state law, 423 F.2d 887 (3d Cir. 1970). As I understand the claim that Mr. Taggart was "drawn out," the issue is whether the brief questioning[2] of Mr. Taggart in the midst of the Woodstock festival was an event of public interest. A decision on a motion for summary judgment was, therefore, appropriate.

Turning to the substantive question as to whether that decision was correct, it seems clear that this case falls within the rule of Time, Inc. v. Hill, *supra*. Since no showing of actual malice was made in the trial court, summary judgment was properly granted.

There is no question that the Woodstock festival itself was an event of public interest nor that Mr. Taggart, by his presence there, was a participant in it. Furthermore, counsel for appellant has conceded in oral argument that if Mr. Taggart had only been filmed and not interviewed, this action would be barred. I fail to see why the mere fact of the brief questions asked should alter that result.

There may arise cases where a reporter or film maker conducts an interview in such a way as to lose the constitutional privilege of Time, Inc. v. Hill, *supra*. For example, where an incident is staged, as in the television series "Candid Camera," it would not seem to be an event of public interest. But here Mr. Taggart was simply filmed going about his ordinary occupation and asked a few questions that directly related to his

---

2. The text of the dialogue from the film is as follows:

"Taggart: 'Okay. Somebody left their cane in here. Some poor fellow will come looking for his cane.'

"Male Voice: 'You're getting a little behind on this job aren't yuh?'

"Taggart: 'Oh, they've been behind right along, besides, it's not the idea of being behind it's you just can't keep up that's what it is.'

"Male Voice: 'Usin' a-quite a bit o' that stuff, huh? (Referring to a spray.)

"Taggart: 'Yeah. That helps give yuh a little pleasanter uh, odor, you know. Yeah, with the disinfectant in there and you put your deodorant bars in, makes it a little more pleasanter to go in there an' use it.

"Taggart: 'That is it, gentlemen.'

"Male Voice: 'Well, you're doing a good job here.

"Taggart: 'Thank you very much (laughs). Glad to do it for these kids. My son's here too. An' I got one over in Viet Nam too. He's up in the DMZ right now. Flyin' helicopters. Okay, see yuh later.' "

participation in, and opinions on, a clearly newsworthy event. This is a common and important technique of investigative reporting and should enjoy the same constitutional protection as would a written or filmed account of that event. I would affirm the district court's granting of summary judgment.