**Cary GRANT, Plaintiff,**

v.

**ESQUIRE, INC. and Forum Sportswear, Inc., Defendants.**

No. 72 Civ. 1041.

United States District Court,
S. D. New York,
Civil Division.

Nov. 27, 1973.

As Amended Nov. 28, 1973.

Walter, Conston, Schurtman & Gumpel, P. C., New York City, for plaintiff; William Schurtman, New York City, of counsel.

Cravath, Swaine & Moore, New York City, for defendants; Harold R. Medina, Jr., Thomas C. Hauser, New York City, of counsel.

## OPINION

WHITMAN KNAPP, District Judge.

The essential facts relevant to the cross motions for summary judgment in this diversity action are not in dispute, and are relatively simple. Back in 1946, Esquire published an article about the clothing tastes and habits of six Hollywood stars, including plaintiff Cary Grant. This article was illustrated with posed pictures of these stars, obtained with their consent. The caption under Mr. Grant's picture was as follows:

"Hollywood Luminary Cary Grant— Cary Grant, ever coming up with the unexpected in pictures (as witness his roles in films from Gunga Din to Notorious with Ingrid Bergman), leans to conservative dress in his private life. Accordingly you see him in his favorite town suit of blue-striped unfinished worsted. The jacket, designed with slightly extended shoulders, has long rolled lapels which emphasize a trim waistline. The shirt, of off-white silk shantung, has a full collar. The black and white small-figured tie is typical of his taste in neckwear. He designs his own easygoing dress shirts, by the way. Made with a fly front, they fasten informally with buttons. As a concession to usage, they have studs but these purely decorative devices go only through the flap of the shirt."

It is to be observed that the foregoing caption provides the reader—in succinct form—with a fair amount of information about Mr. Grant's habits and life style. A considerable segment of the population might well consider this both interesting and informative.

In 1971, Esquire republished the same picture with one modification: everything below the collar line had been replaced with the figure of a model clothed in a cardigan sweater-jacket.

Under the picture was the following caption:

"To give a proper good riddance to the excesses of the Peacock Revolution we have tried a little trickery. And what better way to show the longevity of tradition than by taking the pictures of six modish men that appeared in Esquire in 1946 and garbing the ageless enchantment of these performers in the styles of the Seventies. Above, Cary Grant in a descendant of the classic cardigan, an Orlon double-knit navy, rust, and buff sweater-coat (Forum, $22.50)."

It is to be observed that neither the picture nor the caption tells the reader anything about Mr. Grant. One is not told whether Mr. Grant ever wore a cardigan sweater jacket, or anything else about him except his one-time appearance in the pages of Esquire. Mr. Grant's face serves no function but to attract attention to the article. Presumably the model who posed for the torso got a professional fee for his part in the enterprise. The question presented is whether Esquire had the right to compel Mr. Grant to contribute his face for free.

It is plaintiff's claim that the 1971 Esquire article gives rise to three causes of action: for libel; for invasion of plaintiff's statutory right of privacy; and, while not made explicit in the complaint, for violation of plaintiff's "right of publicity."

Defendants contend that the complaint fails to state any claim as a matter of state law; and that, in any event, all of its claims are barred by the First Amendment and must therefore be dismissed.

It is readily apparent that these claims and contentions pose two basic questions: 1) Has plaintiff stated one or more valid claims under state law? 2) If so, is there a constitutional bar to plaintiff's enforcement of such otherwise valid state claim?

I.

■ Turning to state law, there is no difficulty in disposing of the claim for libel. A succinct exposition of the limits of libel under New York law (absent any showing of special damage) is found in Justice (now Chief Judge Breitel's opinion in Oma v. Hillman Periodicals (1st Dept. 1945) 281 App.Div. 240, 118 N.Y.S.2d 720. There, quoting from an earlier opinion of the Court of Appeals, he observed (at 722):

"Written words, the effect of which is to invade privacy and to bring undesired notoriety, are without remedy, unless they also appreciably affect reputation. * * *

"Reputation is said in a general way to be injured by words which tend to expose one to public hatred, shame, obloquy, contumely, odium, contempt, ridicule, aversion, ostracism, degradation, or disgrace, or to induce an evil opinion of one in the minds of right-thinking persons, and to deprive one of their confidence and friendly intercourse in society."

No amount of "innuendo" could suggest that the Esquire article had any such effect on Mr. Grant. The publication therefore is not, as a matter of law, libelous. The first cause of action is accordingly dismissed.

■ Plaintiff's remaining state claims rest on § 51 of the New York Civil Rights Law, McKinney's Consol. Laws, c. 14 and upon the somewhat related common law "right of publicity". § 51 provides:

"Any person whose name, portrait or picture is used within this state for advertising purposes or for the purposes of trade without the written consent first obtained as above provided may maintain an equitable action in the supreme court of this state against the person, firm or corporation so using his name, portrait or picture, to prevent and restrain the use thereof; and may also sue and re-

cover damages for any injuries sustained by reason of such use.
. . . "

The two key expressions in this section are "for advertising purposes" and "for the purposes of trade". We shall first consider the expression "for advertising purposes". As to that, the Court rules as a matter of law that the article on its face does not constitute an advertisement. Pagan v. N. Y. Herald Tribune (1st Dept. 1969) 32 A.D.2d 341, 301 N.Y.S.2d 120; LaForge v. Fairchild Publications, Inc. (1st Dept. 1965) 23 A.D.2d 636, 257 N.Y.S.2d 127.

Plaintiff contends, however, that he should be allowed to prove that defendants had some covert arrangement with each other which converted the Esquire article into a paid advertisement for the co-defendant Forum. As to that, it seems highly unlikely—in light of the detailed affidavits submitted by defendants on this motion—that plaintiff will be able to establish such a contention. However, the facts—if any—being wholly within defendants' control, plaintiff should have the opportunity to establish its case by pre-trial discovery if he can. Waldron v. British Petroleum Co. (Herlands, J., 1964) 231 F.Supp. 72, 94; 6 Moore's Federal Practice § 56.24. Moreover, plaintiff made a satisfactory showing on oral argument that he cannot properly be charged with laches in this regard. Accordingly, absent any constitutional restraint (as to which see below) the Court will refer the matter to a Magistrate for pre-trial discovery on this limited issue, with directions that it be expeditiously completed.

■ The statutory phrase "for the purposes of trade" is not so easily disposed of. The statutory right to recover damages for the use of one's name for the purpose described in that phrase has had a development influenced by and intertwined with a somewhat disparate common law right known as the right of publicity. See Haelan Laboratories v. Topps (2d Cir. 1953) 202 F.2d 866, cert. den. 346 U.S. 816, 74 S.Ct. 26, 98 L.Ed.

343; Ettore v. Philco Television Broadcasting (3d Cir. 1956) 229 F.2d 481. Cf. Taggart v. Wadleigh-Maurice, Ltd. and Warner Bros. Inc. (3d Cir. 1973) 489 F.2d 434. The "right of publicity" is somewhat akin to the exclusive right of a commercial enterprise to the benefits to be derived from the goodwill and secondary meaning that it has managed to build up in its name. Cf. Wood v. Lucy, Lady Duff-Gordon (1917) 222 N. Y. 88, 118 N.E. 214; Madison Square Garden Corp. v. Universal Pictures Co. (1st Dept. 1938) 255 App.Div. 459, 7 N. Y.S.2d 845.

In seeking to define the limits of this right, the Court must bear in mind the recent observation of the Second Circuit that New York law in this area is in process of development. Galella v. Onassis (2d Cir. 1973) 487 F.2d 986, 995, fn. 12. The Court must, therefore, act as though it were sitting in special term of the Supreme Court, New York County, and fashion a decision it thinks would meet the approval of the New York Court of Appeals. Cooper v. American Airlines (2d Cir. 1945, Judge Frank), 149 F.2d 355. The relevant New York decisions appear to be: Lahiri v. Daily Mirror (Sup.Ct. N.Y. County 1937) 162 Misc. 776, 295 N.Y.S. 382; Oma v. Hillman Periodicals, supra, 118 N.Y.S.2d 720; Booth v. Curtis Publishing Co. (1st Dept. 1962) 15 A.D.2d 343, 223 N. Y.S.2d 737, aff'd 11 N.Y.2d 907, 228 N. Y.S.2d 468, 183 N.E.2d 812; Murray v. New York Magazine (1971) 27 N.Y.2d 406, 318 N.Y.S.2d 474, 267 N.E.2d 256; Rosemont Enterprises, Inc. v. Urban Systems, Inc. (Sup.Ct. N.Y. County 1973) 72 Misc.2d 788, 340 N.Y.S.2d 144.

In all but the last of the cases above cited the plaintiff was denied recovery under § 51, for the reason that in each the court held plaintiff's picture to have been "reasonably related" to a newsworthy subject and thus its use not to have been "for purposes of trade" within the meaning of § 51.

As above indicated, two distinct interests appear to be protected under the general rubric of a "right to privacy".

The first protects that right in its more conventional sense, and permits a private individual to recover damages for injured feelings and general embarrassment if for purposes of trade he is unjustifiably subjected to the harsh and—to him—unwelcome glare of publicity. See, e. g. Flores v. Mosler Safe Co. (1959) 7 N.Y.2d 276, 196 N.Y.S.2d 975, 164 N.E.2d 863. The second—almost the obverse of the first—protects public figures from having the publicity value of their names and reputations unlawfully appropriated by others. Haelan Laboratories, Inc. v. Topps, *supra*, 202 F.2d 866; Selsman v. Universal Photo Books, Inc. (1st Dept. 1963) 18 A.D.2d 151, 238 N.Y.S.2d 686; Ettore v. Philco Television Broadcasting Co., *supra*, 229 F.2d 481; Rosemont Enterprises, Inc. v. Urban Systems, Inc., *supra*, (Sup.Ct. N.Y. County 1973) 72 Misc.2d 788, 340 N.Y. S.2d 144. And see Gordon, "Right of Property in Name, Likeness, Personality and History" (1960) 55 N.W.L.Rev. 553, Hogan v. Barnes (1957) 114 U.S.P.Q. 314. It is the second of these aspects that plaintiff Grant seems particularly to be invoking in this litigation.[1]

There is obvious difficulty in defining a "right of privacy" for public personages. Moreover, plaintiff Grant has complicated the difficulty by asserting that he does not want anyone—himself included—to profit by the publicity value of his name and reputation.

To obviate at least the latter difficulty, let us shift our focus from the reticent Mr. Grant and consider the problem from the point of view of one who makes no bones about the commercial exploitation of publicity, the famous English fashion model, Leslie Hornby, commonly known as "Twiggy". Two things are clear in her case: (a) she has amassed a small fortune by exploiting the publicity value of her looks, name and reputation; and (b) in the process, she has become a public personage. In the latter capacity she has become fair game for the media. If she should appear, for example, at the opera in a Givenchy creation she could not complain if her photograph appeared in a newspaper, a magazine, or on television in connection with a story about the opera, about fashions, or about the life and times of Twiggy herself. However, it by no means follows that publishers could present an apparently posed picture of Twiggy and—without her consent—use it in competition with other pictures for which she had professionally posed or in competition with (or in substitution for) the professionally posed pictures of other models. *A fortiori*, no magazine could without her consent crop her head off a posed photograph [2] and superimpose it on the torso of another model.

The question then arises whether the rights of plaintiff Grant—because of his renunciation of any desire to exploit the commercial value of his own name and fame—should be any different than those of Twiggy. We think not. If the owner of Blackacre decides for reasons of his own not to use his land but to keep it in reserve he is not precluded from prosecuting trespassers.

It follows that—absent any constitutional prohibition—the motion for summary judgment will be denied as to the "for purposes of trade" phase of the

1. This aspect of plaintiff's claim—although spelled out in oral argument of the instant motions—is by no means clearly stated in the complaint. In former times, this lack of clarity might well have provided sufficient reason to dismiss the complaint. However, under today's liberal rules, plaintiff's pleading must be deemed adequate to support the theory urged on oral argument. See e. g. Siegelman v. Cunard White Star (2d Cir. 1955) 221 F.2d 189, at 196, where then Judge Harlan stated:

"Under Rule 8, a pleading must contain a short and plain statement of the claim showing that the pleader is entitled to relief. It is not necessary to set out the legal theory on which the claim is based."

2. The circumstance that—in plaintiff Grant's case—the defendant magazine had obtained his consent for the original photograph is irrelevant. We surely would have been told had the terms of the 1946 consent been broad enough to cover the 1971 reuse.

complaint, and the jury will be asked to decide whether defendant Esquire has appropriated plaintiff Grant's picture for purposes of trade—e. g. merely to attract attention—or whether the picture was used in the course of some legitimate comment on a public figure or subject of public interest with which plaintiff has voluntarily associated himself. [Cf. *Taggart, supra.*]

■ A word about damages. If the jury decides in plaintiff Grant's favor he will of course be entitled to recover for any lacerations to his feelings that he may be able to establish. More importantly, however, he will be able to recover the fair market value of the use for the purposes of trade of his face, name and reputation. The Court has no present suggestion as to how this should be proved. However, the Court can take judicial notice that there is a fairly active market for exploitation of the faces, names and reputations of celebrities, and such market—like any other—must have its recognized rules and experts. One element of damage will probably be the fact—if it be a fact—that Mr. Grant has never sanctioned his commercial use as a photographic model. There may well be a recognized first-time value (which diminishes with use) which the jury might find defendants to have appropriated.

■ With respect to the "advertising" phase of plaintiff's claim, he would, of course, be entitled to punitive damages should he be able to establish that defendants had secretly and deliberately used his likeness in a commercial advertisement.[3] Punitive damages would not be available under the other phases of his claim as nothing in the affidavits submitted would appear to support a finding of bad faith.

## II.

■ We turn now to the question whether there exists a constitutional bar to any of the relief just proposed. We start with the proposition that no state —and therefore no federal court exercising diversity jurisdiction—may impose sanctions or grant civil relief which would tend to chill or impair the free exercise of rights guaranteed by the First Amendment. Near v. Minnesota (1931) 283 U.S. 697, 51 S.Ct. 625, 75 L. Ed. 1357; Herndon v. Lowry (1937) 301 U.S. 242, 57 S.Ct. 732, 81 L.Ed. 1066; Winters v. New York (1948) 333 U.S. 507, 68 S.Ct. 665, 92 L.Ed. 840; Wood v. Georgia (1962) 370 U.S. 375, 82 S.Ct. 1364, 8 L.Ed.2d 569; NAACP v. Button (1963) 371 U.S. 415, 83 S.Ct. 328, 9 L. Ed.2d 405; New York Times v. Sullivan (1964) 376 U.S. 254, 84 S.Ct. 710, 11 L. Ed.2d 686; Cox v. Louisiana (1965) 379 U.S. 536, 559, 85 S.Ct. 453, 476, 13 L. Ed.2d 471, 487; Amalgamated Food Employees v. Logan Valley Plaza (1968) 391 U.S. 308, 88 S.Ct. 1601, 20 L.Ed.2d 603; Tinker v. Des Moines School District (1969) 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731; Street v. New York (1969) 394 U.S. 576, 89 S.Ct. 1354, 22 L.Ed.2d 572; Stanley v. Georgia (1969) 394 U.S. 557, 89 S.Ct. 1243, 22 L.Ed.2d 542; Cohen v. California (1971) 403 U. S. 15, 91 S.Ct. 1780, 29 L.Ed.2d 284.

■ Indeed, so careful are the courts in protecting the exercise of these rights that they will sometimes go so far as to deny a plaintiff what in other circumstances would be considered his right to a day in court. The rationale is that the mere threat of even an ultimately unsuccessful lawsuit might deter a prospective defendant from the full exploitation of his First Amendment rights. Therefore in situations where such a possibility can be said to exist, a plaintiff must make a far more persuasive showing than required of an ordinary litigant in order to defeat a defense motion for summary judgment. See Trails West, Inc. v. Wolff (1973) 32 N.Y.2d 207, 344 N.Y.S.2d 863, 298 N.E.2d 52; Washington Post Co. v. Keogh (1966) 125 U.S. App.D.C. 32, 365 F.2d 965, cert. denied (1967) 385 U.S. 1011, 87 S.Ct. 708, 17 L.Ed.2d 548; Hurley v. Northwest Pub-

---

3. Section 51 provides that exemplary damages may be awarded for "knowing" violations.

lications, Inc. (D.Minn.1967) 273 F. Supp. 967, aff'd (8th Cir.) 398 F.2d 346; United Medical v. CBS (9th Cir. 1968) 404 F.2d 706, cert. denied (1969) 394 U.S. 921, 89 S.Ct. 1197, 22 L.Ed.2d 454; Dacey v. Florida Bar (5th Cir. 1970) 427 F.2d 1292; Thompson v. Evening Star (1968) 129 U.S.App.D.C. 299, 394 F.2d 774, cert. denied (1968) 393 U.S. 884, 89 S.Ct. 194, 21 L.Ed.2d 160; Walker v. Pulitzer Pub. Co. (8th Cir. 1968) 394 F.2d 800; Time, Inc. v. McLaney (5th Cir. 1969) 406 F.2d 565, cert. denied (1969) 395 U.S. 922, 89 S. Ct. 1776, 23 L.Ed.2d 239; Bon Air Hotel, Inc. v. Time, Inc. (S.D.Ga.1969) 295 F.Supp. 704, aff'd (5th Cir. 1970) 426 F.2d 858; Sellers v. Time, Inc. (E.D. Pa.1969) 299 F.Supp. 582, aff'd (3d Cir. 1970) 423 F.2d 887, cert. denied (1970) 400 U.S. 830, 91 S.Ct. 61, 27 L.Ed.2d 61; Cerrito v. Time, Inc. (N.D.Cal.1969) 302 F.Supp. 1071, aff'd (9th Cir. 1971) 449 F.2d 306; Medina v. Time, Inc. (D. Mass.1970) 319 F.Supp. 398, aff'd (1st Cir. 1971) 439 F.2d 1129; Spern v. Time, Inc. (W.D.Pa.1971) 324 F.Supp. 1201; Johnston v. Time, Inc. (4th Cir. 1971) 448 F.2d 378; Cervantes v. Time, Inc. (E.D.Mo.1971) 330 F.Supp. 936; Goldman v. Time, Inc. (N.D.Calif.1971) 336 F.Supp. 133.

■ We come therefore to the critical question: Is this a case where relief granted to this plaintiff—or the mere threat of litigation—would tend to inhibit this defendant—or any other publisher who might learn of the decision —in the untrammeled exercise of any right guaranteed by the First Amendment? For reasons which follow, we think not.

One must never lose sight of the purpose behind the decisions implementing the First Amendment. The Supreme Court does not closely scrutinize restraints on obscenity because it feels that obscene literature is any boon to mankind. On the contrary, it scrutinizes such restraints solely because it feels that the concept of obscenity is so vague that unless rigorously circumscribed the fear of obscenity prosecution might inhibit the free expression of artistic talent. Thus, in Roth v. United States (1957) 354 U.S. 476, at 488, 77 S.Ct. 1304, at 1311, 1 L.Ed.2d 1498, the Court, speaking through Mr. Justice Brennan, observed:

"The fundamental freedoms of speech and press have contributed greatly to the development and well-being of our free society and are indispensable to its continued growth. Ceaseless vigilance is the watchword to prevent their erosion by Congress or by the States. The door barring federal and state intrusion into this area cannot be left ajar; it must be kept tightly closed and opened only the slightest crack necessary to prevent encroachment upon more important interests. It is therefore vital that the standards for judging obscenity safeguard the protection of freedom of speech and press for material which does not treat sex in a manner appealing to prurient interest."

Similarly with libel, the Court has no desire to encourage libelous publications. However, it has concluded—or rather it has decided that the Founding Fathers had concluded—that a considerable risk of unchecked libel (with its inevitably resulting private injustices) is preferable to a relatively slight risk of impeding untrammeled public debate. As observed in Rosenbloom v. Metromedia (1971) 403 U.S. 29, at 49–50, 91 S.Ct. 1811, at 1823, 29 L.Ed.2d 296, per Mr. Justice Brennan:

" * * * the vital needs of freedom of the press and freedom of speech persuade us that allowing private citizens to obtain damage judgments on the basis of a jury determination that a publisher probably failed to use reasonable care would not provide adequate 'breathing space' for these great freedoms. Reasonable care is an 'elusive standard' that 'would place on the press the intolerable burden of guessing how a jury might assess the reasonableness of steps taken by it . . .' Fear of guessing wrong must inevitably cause self-censorship

and thus create the danger that the legitimate utterance will be deterred."

Are any such risks here involved? We perceive none.

This decision tells this publisher—or any other that may learn of it—just two things:

(a) It must refrain from making under-the-table arrangements with actual or potential advertisers which would convert an apparent news story into a paid advertisement; and if it can be established by competent evidence that the publisher has not so refrained, it must respond in damages; and

(b) If the publisher feels impelled to trade upon the name and reputation of a celebrity, it must pay the going rate for such benefit.

As to the first of these matters, it must be observed that the publisher's editorial or artistic personnel would not in all probability be aware of the existence—or non-existence—of undercover arrangements. Their prohibition—or the threat of litigation in that regard—could therefore have no possible chilling effect upon the exercise of editorial or artistic initiative.

Although not so starkly clear, the result is no different in the second situation. As we see it, the publisher is in no different position than a painter who feels he needs certain pigments and oils to create a contemplated masterpiece.

While a more sympathetic case might be made for an impecunious painter than for an abundantly solvent publisher, nobody would seriously contend that artistic need would authorize a painter to walk into a supply store and help himself to whatever he might require.

With respect to any possible chilling effect of the particular requirement recognized by this decision, the Court can take judicial notice that there is no shortage of celebrities who—for an appropriate fee—are only too happy to lend their faces, names and reputations for exploitations in such enterprises as the one here involved.[4] There is no conceivable artistic or editorial purpose served by Mr. Grant's picture that would not equally well have been served by any one of numerous other celebrities.

Defendants contend that Mr. Grant's picture uniquely suited its purpose by virtue of its prior publication in 1946, and cite Time, Inc. v. Hill (1967) 385 U.S. 374, 87 S.Ct. 534, 17 L.Ed.2d 456 as authority for their right to make use of it. Such reliance on *Hill* is misplaced. The doctrine of that case was succinctly stated by Mr. Justice Brennan speaking for the Court (385 U.S. at 387–388, 87 S.Ct. at 542):

"We hold that the constitutional protections for speech and press preclude the application of the New York statute [Civil Rights Law §§ 50–51] to redress false reports of matters of public interest in the absence of proof that the defendant published the re-

---

4. The defendant Esquire's editorial personnel seem less terrified than its counsel at the prospect of having to gain consent for the use of pictures in situations such as this one. During the pendency of this litigation Mr. Grant received the following letter from defendant: "Dear Mr. Grant: As an editor of Esquire, I am in the process of compiling a four-page feature on shaving. Its premise is a simple one: for most of us, shaving is an abrasive and tedious way to begin a day. Esquire will provide the advice of four famous experts, along with photographs of them as they shave.

"We should be delighted to have you as one of our four experts. We would hope to have your own description (up to about three typewritten pages in length) of how you shave, a more or less stepbystep description concentrating on any special techniques you have for avoiding cuts, abrasions, and rashes. We would also hope, of course, for your consent to be photographed while shaving.

"I need hardly add that your participation would add greatly to the authority of any feature on men's grooming. Thank you in advance for your consideration. Very best, Ben Pesta, Associate Editor"

port with knowledge of its falsity or in reckless disregard of the truth."

Applying that doctrine to the facts before it, the Court went on to observe (at 388, 87 S.Ct. at 542):

"We have no doubt that the subject of the Life article, the opening of a new play linked to an actual incident, is a matter of public interest."

It has already been observed that nothing—true or false—was said about Mr. Grant in the 1971 Esquire article, except to identify him as having appeared in Esquire in 1946. Certainly it cannot successfully be contended that *Hill*—or any other case—stands for the proposition that where a celebrity once permits his picture to be used in a publication (whether gratis or for a fee) the publisher can, by a simple device of referring to the original appearance as an "event", convert the original permission into a perpetual license to use the celebrity as an unpaid professional model.

Taggart v. Wadleigh-Maurice, *supra* (3d Cir. September 21, 1973) presents an interesting illustration of the problem here involved. Plaintiff in that case had been an employee of a company which had contracted to provide portable latrines to the now famous Woodstock music festival. Plaintiff's job had been to empty the latrines. In the course of shooting film for their documentary "Woodstock", defendant movie makers: (a) shot pictures of plaintiff going about his task; and (b) engaged him in conversation, producing comic effects which defendants included in their final product, to great critical acclaim. Plaintiff sued under § 51. In reversing a grant of summary judgment for de-

fendant, the Third Circuit Court of Appeals found that an issue of fact was presented by the question whether plaintiff had been "drawn out as a performer" rather than merely "photographed as a participant in a newsworthy event". Although the Court articulated the question in slightly different language, the message of *Taggart* appears to be that the First Amendment does not absolve movie companies—or publishers—from the obligation of paying their help. They are entitled to photograph newsworthy events, but they are not entitled to convert unsuspecting citizens into unpaid professional actors. So here, defendant is entitled to report (either with or without pictures) almost any activity in which Mr. Grant might engage. It is not entitled to appropriate his services as a professional model.

*Taggart* seems to echo a sentiment expressed some years ago when the Supreme Court upheld the Wagner Act as applied to the Associated Press (Associated Press v. Labor Board [1937] 301 U.S. 103, 132–133, 57 S.Ct. 650, 656, 81 L.Ed. 953):

"The business of the Associated Press is not immune from regulation because it is an agency of the press. The publisher of a newspaper has no special immunity from the application of general laws. He has no special privilege to invade the rights and liberties of others." [5]

For the foregoing reasons, the pending motions are disposed of as follows: Plaintiff's motion for summary judgment is denied. The defendants' motion is granted insofar as it seeks to dismiss the first count of the complaint,[6] and is

---

5. While the Court went on to cite some duties of the press that have since been modified—for example, its duty to "answer for libel"—the main point is still well taken.

6. Were it to be determined that the publication was libelous as a matter of state law,

we would find no constitutional bar to an award of damages. For reasons above stated, no sanction against this particular use of plaintiff Grant's picture (whether in the form of a libel action or otherwise) would impede anyone's free exercise of First Amendment rights.

otherwise denied. The matter is referred to a magistrate to supervise pretrial discovery on the question whether there existed clandestine arrangements between the defendants which would convert an apparent news story into a paid advertisement, with leave to defendants at the close of such discovery —if they be so advised—to renew their motion insofar as it relates to the "purposes of advertising" phase of the second count. If upon such renewal the Court finds that no issue of fact is presented as to the existence of such clandestine arrangements, the complaint as against defendant Forum will be dismissed in its entirety.

The Court is convinced that no party to this action is desirous of litigating except for the purpose of establishing his or its respective legal rights, that once those rights are defined a financial settlement between the parties will readily be arrived at, and that the competence of counsel for the respective parties would assure complete and thoughtful appellate briefing. The Court therefore certifies this case to the Court of Appeals pursuant to 28 U.S.C. § 1292(b), certifying that its order involves controlling questions of law as to which there is substantial ground for difference of opinion and that an immediate appeal may materially advance the ultimate termination of the litigation.[7] All further proceedings are stayed for ten days to permit the parties to make appropriate application to the Court of Appeals. If such application is made, the stay is extended until the Court of Appeals acts upon it. If that Court should grant the application, the stay is extended until its final decision is rendered.

So ordered.

7. The fundamental question presented is whether the Court correctly ruled that the First Amendment does not bar granting the relief sought by plaintiff. Should the Court of Appeals answer that question in the affirmative, the following subsidiary questions would have to be decided in order to bring the litigation to a conclusion:

(a) Did the Court properly apply state law in dismissing the first count?
(b) Did the Court properly apply state law in defining the extent of relief available to plaintiff with respect to his claim that his picture had been used (i) for advertising purposes, (ii) for the purposes of trade, and (iii) in violation of his right of publicity?